Billings, Thomas P., J.
The parties have filed cross motions to litigate what is essentially the same discovery dispute: whether the defendants should be entitled to discovery of (a) communications among the plaintiffs and their counsel, and (b) information concerning the plaintiffs’ income and assets. The plaintiffs additionally (c) seek dismissal of a different case in this County (Civil Action commenced by one of the defendants against an affiliate of the plaintiffs. New Boston Huntington VI Limited Partnership v. Greenleaf Arms Realty Trust II, LLC, Suffolk Civil Action No. 12-1734). Each side expresses the customary outrage at the other and its positions, and seeks sanctions.
For the reasons that follow, each cross motion is ALLOWED IN PART and DENIED IN PART, as more fully set forth in the Order below.
BACKGROUND
The following is a brief summary of the allegations of the Complaint (including the exhibits thereto), insofar as relevant to the present discovery (etc.) dispute. The individual plaintiffs (the “Bagliones”) were the beneficial owners of a boarding house in Quincy known as the Greenleaf Arms. The defendant entities are part of a real estate empire controlled by the Rappaport family. In 2002 the Bagliones, at the defendants’ suggestion, sold the Greenleaf property and used $1.3 million of the proceeds to acquire limited partnership interests in two real estate investment funds, New Boston Investor Fund v. and New Boston Investor Fund VI (“Fund V” and “Fund VI,” respectively), managed and/or controlled by the Rappaports.
The union proved an unhappy one, for reasons that need not be detailed here (but which had to do, in part, with tax risks that the Bagliones alleged were not appropriately disclosed to them). The short-term result was Joseph Baglione et al. v. New Boston Fund, Inc. et al., Suffolk Civil Action No. 06-5053 (the “2006 lawsuit”), in which the Bagliones asserted claims for fraud, breach of fiduciary duty, and other theories of relief.
In reasonably short order, the parties reached an agreement, and the 2006 lawsuit was dismissed. Under the terms of the Settlement Agreement, dated May 24, 2007, the “New Boston Parties” agreed to pay the Bagliones $300,000, allocable in agreed amounts to federal and state taxes and attorneys fees. Additionally, in redemption of the Bagliones’ entire interest in Fund VI, Fund VI was to distribute to the Bagliones (or to a special purpose entity or entities they controlled) 10.81% beneficial interests in each of two nominee realty trusts, one of which owned 2 Technology Drive, Westborough, Massachusetts and the other of which owned 751 International Drive, Franklin, Indiana.[1] All of the beneficial owners of the two properties were then to enter into a Tenant-in-Common agreement on terms satisfactory to all. To hold their tenant-in-common interests, the Bagliones created two limited liability companies — Greenleaf Arms Realty Trust I, LLC (“Trust I,” for 2 Technology Drive ) and Greenleaf Arms Realty Trust II, LLC (“Trust II,” for 751 International Drive).
The Settlement Agreement comprises ten pages including signatures, and has the appearance of having been carefully negotiated and drafted. The New Boston/Rappaport side was represented by Attys. Mark Berthiaume and Joseph Darby of Greenberg Traurig; the Bagliones, by Atty. Stephen Ziobrowski, a tax specialist with Day Pitney LLP, and Atty. Michael McLaughlin.
As matters unfolded, however, accord was supplanted by dissatisfaction. In October 2008, Fund VI suspended cash distributions to its investors, citing the downturn in the real estate market and the need to build a cash reserve; apparently, the suspension also applied to Trust I, as tenant in common. Also, the full-building tenant of Two Technology Drive indicated that it would not be renewing its lease, which was to expire May 31, 2009, and no new tenant was in the offing. This caused a default on the mortgage and the loss of all equiiy in the property (Fund VTs and Trust I’s).
The centerpiece of the plaintiffs’ complaint is the allegation that the defendants induced the plaintiffs to enter into the settlement and tenancy in common agreements with representations
That the tenancy in common arrangement would result in an increase to the quarterly distributions to the plaintiffs (¶30);
That the Two Technology Drive property had a value of $15,353,333 (¶32);
That the total value of the 32 properties held by Fund VI was $816,508,701, and that the plaintiffs’ interest in Fund VI which was being surrendered in exchange for the tenancies in common was 10.81% and was worth $815,129.28 (¶¶22, 34-37).
Some or all of these representations were false. The defendants also failed to disclose that the Two Technology Drive mortgage loan was “in default or close to default” (¶¶42-44) and that the lease “was, for all intents and appraisal purposes, terminated, thereby resulting in the building having a zero cash flow.”[2]
The Complaint also alleges that as a result of the degradation of their investment, the Bagliones have lost their retirement income; they have been forced to sell their Florida home; and Mrs. Baglione has been unable to retire. There are claims for fraud in the inducement of the settlement and tenancy-in-common agreements, negligent misrepresentation, failure of fiduciaiy duty, violations of Chapters 93A and 110A (the Massachusetts Uniform Securities Act), negligent *479 infliction of emotional distress, and breach of the covenant of good faith and fair dealing.
THE DISCOVERY REQUESTS
Defendants’ First Request for Production of Documents asks that the plaintiffs produce all of their communications withAtiys. McLaughlin (Request No. 2) and Atty. Ziobrowski and the firm of Day Pitney (No. 3) concerning the Settlement Agreement; as well as the attorneys’ communications with each other (No. 4) and “all communications between Plaintiffs and any other Person” on the same subject. The same items (and more) are requested by way of a deposition subpoena addressed to Atty. Ziobrowski.
The document request additionally seeks communications between the plaintiffs and any tax preparers or accountants with respect to the settlement agreement (No. 9), documents concerning the Bagliones’ tax returns or liabilities 2004-present (No. 11), and documents concerning their assets, sources of income, and Mrs. Baglione’s employment (Nos. 11, 12 and 17).
DISCUSSION
The requests for attorney-client communications implicate issues of privilege; those for information concerning the Bagliones’ income and assets, issues of relevance.
A. Attorney-Client Privilege
There does not appear to be any dispute that the plaintiffs were clients of Attys. Ziobrowski and McLaughlin; that the communications in question (or some of them) (a) were between attorney(s) and client(s) acting as such (or between the two attorneys in the course of their joint representation of their common clients), (b) were for the purpose of seeking or rendering legal advice, and (c) were made in confidence. They are therefore privileged, see Commissioner of Revenue v. Comcast Corp., 453 Mass. 293, 303 (2009), absent an exception (see Mass. Guide to Evidence §502(d)) or a waiver.
The defendants argue waiver; specifically, that the plaintiffs have waived their privilege by attaching an attorney-client communication as an exhibit to the Complaint in this matter, and by placing attorney-client communications at issue by the nature of their claims.
1. Complaint Exhibit F
Exhibit F to the Complaint is a two-page printout of two e-mails. The first in time, comprising the bottom third of the first page,[3] is Atty. Berthiaume’s (the defendants’ attorney’s) e-mail to Atty. Ziobrowski on May 16, 2007 at 2:28 p.m. The subject is the value of the Bagliones’ investment account in Fund VI. This was an issue because in the then-ongoing negotiation of the Settlement Agreement, the percentage interest that the plaintiffs were to receive in Two Technology Drive and 751 International Drive as tenants in common was to depend on the valuation of the Fund VI account that they were surrendering for it. In the e-mail, Berthiaume reports to Ziobrowski that he has “just learned” that the Bagliones had recently received a return of capital which reduced the value of their Fund VI investment from $820,252.83 to $815,129.28. This, he said, meant that their tenancy in common share ought to be 10.81%, rather than 10.88% as, apparently, had previously been proposed.
The top two-thirds of the first page is an e-mail from Atty. Ziobrowsky, sent fifty-nine minutes later, forwarding the Berthiaume e-mail to Atty. McLaughlin and the Bagliones. Ziobrowsky observed that “(t]he reduction would be .07%,” and suggested three possible responses to the proposal and the arguments in favor of each:
How to respond? The options are:
(1) Insist on 10.88%. Joe and Faye should have gotten their money back in February, so this just compensates them for the loss of the use of the money. If New Boston is unhappy about this, they should have closed the deal sooner.
(2) Go along with 10.81%. The values we used are not supported by appraisals and are necessarily imprecise. This is too small to hold up the deal.
(3) Compromise at 10.85%. A number in between just to settle this.
My vote would be #1. Let’s discuss.
The disclosure of this e-mail, the defendants argue, was a waiver of all attorney-client communications concerning the e-mail’s subject matter, which they maintain extends to “the general issue of how the values used by the parties for purposes of the Settlement Agreement were derived.”
The plaintiffs respond that the disclosure was inadvertent and therefore not a waiver. This may be so: the significance of Exhibit F, as it is discussed in paragraph 34 of the Complaint, is the statement in Berthiaume’s e-mail as to the valuation of the plaintiffs’ interest in Fund VI, not Atty. Ziobrowski’s views concerning the proposed percentage reduction; in fact, neither these views nor Ziobrowski’s e-mail are mentioned in the complaint. I accept the representation that Mr. McLaughlin’s (the drafter’s) purpose was to include Berthiaume’s e-mail and not Ziobrowski’s.
-That said, this was a long way removed from a paralegal’s inadvertent inclusion of a privileged document in a banker’s box (or, these days, a compact disc or flash drive) full of document production. It was attached as an exhibit to the Complaint, for all to see.
Since then, the case has seen a motion to dismiss; its allowance; an appeal of the decision to the Appeals Court; a reversal; the defendants’ request for further appellate review; and the SJC’s denial. The defendants’ brief on the motion to dismiss mentioned the Ziobrowski e-mail and showcased his statement that “(t)he values we used are not supported by ap *480 praisals and are necessarily imprecise.”[4] Plaintiffs counsel, naturally, included the Complaint with all exhibits in the Record Appendix. Defense counsel again quoted the same sentence from Exhibit F in the appellees’ brief, and yet again — after the Appeals Court reversed this Court’s order of dismissal — in the application for further appellate review.
Massachusetts has departed from the “traditional view . . . that, once the contents of a document had become public regardless of the means by which this came about, the document’s confidentiality and privilege had been destroyed,” favoring instead the more “(m]odem” rule that “the inadvertent loss, interception, or disclosure of privileged communications does not destroy the privilege, so long as reasonable precautions against such disclosure are taken.” In the Matter of the Reorganization of Electric Mutual Liability Ins. Co. Ltd. (Bermuda), 425 Mass. 419, 422 (1997), quoting S.N. Stone & R.K. Taylor, Testimonial Privileges §1.54, at 1-143 (2d ed.1995).
Including an attorney-client communication among the exhibits to a complaint hardly seems emblematic of “reasonable precautions” to preserve its confidentiality; nor does what has come afterward. Rule 502(b) of the Federal Rules of Evidence expressly includes post-disclosure repair efforts, or lack thereof, among its considerations on the issue of waiver:
When made in a federal proceeding or to a federal office or agency, the disclosure does not operate as a waiver in a federal or state proceeding if:
(1) the disclosure is inadvertent;
(2) the holder of the privilege or protection took reasonable steps to prevent disclosure; and
(3) the holder promptly took reasonable steps to rectify the error, including (if applicable) following Federal Rule of Civil Procedure 26(b)(5)(B). (Emphasis supplied.)
This approach seems consonant with Massachusetts law, and I adopt it. See, e.g., Commerce & Industry Ins. Co. v. E.I. Du Pont de Nemours and Company, 2000 WL 33223235, 12 Mass. L. Rptr. 574 (Mass.Super. 2000; van Gestel, J.) (“Delay in seeking relief from inadvertence is an element to weigh in the balancing process to be performed”).
The first evidence in the motion papers of a written demand, or even suggestion, that the e-mail be returned is a copy of a letter from Mr. McLaughlin to Mr. Berthiaume dated June 25, 2012, stating that “you and I have discussed in the past that you were going to return” the e-mail. Whether or not there had been such discussions,[5] and even assuming the initial disclosure could be excused, the absence of any attempt over the next three years to remedy it with (at least) a written demand fell short of reasonable efforts. Any privilege attaching to the Ziobrowski e-mail has been waived.
As noted above, however, the defendants go farther than this, arguing that the release of the e-mail was also a waiver of the privilege as to all communications on the same subject matter. Here, too, the Federal Rules of Evidence address the issue:
When the disclosure is made in a federal proceeding or to a federal office or agency and waives the attorney-client privilege or work-product protection, the waiver extends to an undisclosed communication or information in a federal or state proceeding only if:
(1) the waiver is intentional,
(2) the disclosed and undisclosed communications or information concern the same subject matter; and
(3) they ought in fairness to be considered together.
F.R.Ev. 502(a) (emphasis supplied).
This approach likewise seems fully consistent with Massachusetts law[6] and with basic fairness, and I follow it here. It bears remembering that the attorney-client privilege belongs to the client. That the client’s representative has let the cat out of the bag, inadvertently and without authorization, should not entitle the adverse party to take the horse, the dog, the hamsters, and the goldfish too. The attorney-client privilege is deemed waived as to the Ziobrowski e-mail, but not as to other privileged communications on the same or any other subject.
2. “At Issue” Waiver
Nonetheless, the defendants next assert, there has been a more general waiver of the privilege owing to the Very nature of the claims that the plaintiffs assert, several of which have reliance or something similar as an element. In a fraud case, the old question, “What did [they] know, and when did [they] know it” has application to plaintiffs as well as to defendants. By placing their reliance — and thus their knowledge — in issue, the defendants argue, the plaintiffs have waived any claim of privilege with respect to the information and advice they received from their counsel in connection with the Settlement Agreement.
The SJC has approved, but has not yet fully delineated, the concept of the “at issue” waiver. In Darius v. City of Boston, 433 Mass. 274 (2001), the court
accepted], as a general principle, that a litigant may implicitly waive the attorney-client privilege, at least partly, by injecting certain claims or defenses into a case . . . The difficulty lies not in recognizing that a party may implicitly waive the privilege in certain circumstances, but in identifying what those circumstances are and in formulating a workable rule for determining what constitutes an “at issue” waiver in a given case.
Id. at 277-78.
Although the court was able to decide the case before it[7] without “formulat[ing] an exact definition of the ‘at issue’ waiver doctrine under Massachusetts law,” it did impose two limitations on the doctrine: an *481 at issue waiver (1) “is a limited waiver of the privilege with respect to what has been put ‘at issue,’ ” and (2) may not be invoked “unless it is shown that the privileged information sought to be discovered is not available from any other source.” 433 Mass. at 283, 284. The court also observed that the “at issue” doctrine has been controversial, some courts and commentators criticizing what is seen as an overly “liberal! ]” (i.e., waiver-friendly) approach:
Some decisions have . . . extended the doctrine broadly to cases in which a mental state asserted by a client is sought to be shown inconsistent with the advice of counsel. Such extensions seem dubious . . .
Id. at 279, quoting 1 McCormick, Evidence §93, at 373 (5th ed. 1999).[8]
Two years after Darius, in Buster v. George W. Moore, Inc., 438 Mass. 635 (2003), the SJC gave further consideration to the contours of an “at issue” waiver. Buster was an acrimonious and complicated neighbor-on-neighbor land use dispute. One of the issues was whether the defendants had violated the Massachusetts Civil Rights Act when they acquired the seriously overdue note and mortgage on the plaintiffs’ abutting property; offered the plaintiff forbearance on the note if he would withdraw his appeal of wetlands permits for the development of the defendants’ parcel; then foreclosed on the property when he refused. In partial defense of these actions, the defendants represented in a court filing that they had been confident they would prevail on the appeal anyhow. This, the trial judge ruled and the SJC agreed, was not an “at-issue” waiver of otherwise privileged documents relating to the merits of the permitting issue. In the words of the SJC: “To abrogate the attorney-client privilege merely because of a litigant’s invocation of a legal position or theory in a pleading ‘would pry open the attorney-client relationship and strike at the very core of the privilege.’ ” Id. at 654, quoting Darius, 433 Mass. at 280.
Like Buster and Darius, this is not a case in which the plaintiffs have affirmatively and directly placed client communications at issue, such as by bringing a legal malpractice action, see Zabin v. Picciotto, 73 Mass.App.Ct. 141, 157 (2008), or asserting an advice-of-counsel defense, see Rhodes v. AIG Domestic Claims, Inc., 2006 WL 307911 (Mass.Super. 2006; Gants, J.) [20 Mass. L. Rptr. 491). What they have done is to assert claims which put their state of mind— knowledge, reliance, etc. — in issue.
As I interpret Buster and Darius, this is not enough, nor should it be. “By ‘encourag[ing] full and frank communication between attorneys and their clients,’ the attorney-client privilege ‘promotels] broader public interests in the observance of law and administration of justice.’ ” Suffolk Constr. Co. v. Division of Capital Asset Mgt., 449 Mass. 444, 449 (2007), quoting Upjohn Co. v. United States, 449 U.S. 383, 389 (1981). It accomplishes this by encouraging those in need of legal advice to obtain it, and by permitting attorney and client to speak freely, without “apprehension of disclosure.” Purcell v. District Attorney for the Suffolk Dist., 424 Mass. 109, 117 (1997) (citations omitted).
Granted, this “important societal interest is ... in tension ‘with society’s need for full and complete disclosure’ in adversary proceedings,” and these competing interests need to be balanced. Commissioner of Rev. v. Comcast Corp., 453 Mass. 293, 304 (2009) (citations omitted). Still, the mere fact that a party to a commercial transaction chose to be represented by counsel and later asserted a fraud claim should not, without more, mean that he has thereby agreed to open his attorney’s files to the other side’s perusal, in search of evidence that he learned something from his attorney that the defendant did not disclose.[9] There was no “at issue” waiver of the attorney-client privilege here.
B. Income, Assets, and Relevance
Concerning the discovery sought of the plaintiffs’ income and assets, the Complaint seeks damages for emotional distress, supported by allegations of the plaintiffs’ diminished and precarious financial state as a result of their losses in the tenancy-in-common investment. In this, they have placed their financial condition at issue, and the defendants are entitled to discovery on it, with reasonable protection against the disclosure or use of the information outside this litigation.[10]
C. Withdrawal of the Other Suffolk Case
In the second Suffolk case, referenced at the outset of this decision, Fund VI alleges that the Bagliones, through Trust II, have withheld agreement to a modification of the mortgage loan on the 751 International Drive property, and that under the terms of the tenancy-in-common agreement Fund VI is therefore entitled to purchase Trust II’s interest at the lower of fair market value or the initial equity of the “Dissenting Tenant,” which it places at $273,772.65. Fund VI seeks a declaratory judgment to this effect.
The plaintiffs, in their Motion for Protective Order in this case, attach a copy of the complaint in the other case, and note that it makes no reference to this one. Suggesting that this is a further example of the defendants’ practice of providing “ ‘conspicuously incomplete’ and ‘misleading’ information” to courts and others, they seek an order in this case that the defendants withdraw the other one.
How all of this is related to the discovery dispute, or why the Court should, in addressing discovery issues in the present case, consider requiring dismissal of a different case, is not apparent, at least to me. This much of the relief sought is therefore denied.
*482 D. Sanctions
For the most part, I find that the disputes addressed by these cross motions were entered into in good faith, and that the attorney-client privilege issue, in particular, presented a close question of law on which the parties could differ reasonably and in good faith. Each side, therefore, is to bear its own costs and fees.
ORDER
For the foregoing reasons, it is ORDERED:
1. The plaintiffs have waived any privilege as to e-mails attached as Exhibit F to the Complaint and already in the defendants’ hands, but have not otherwise waived the attorney-client or attorney work product privileges. The plaintiffs therefore need not produce any privileged material in response to the Request for Production of Documents, but shall prepare and serve the privilege log required by Mass.R.Civ.P. 26(b)(5). The plaintiffs’ attorney-client privilege is likewise preserved for purposes of their testimony by deposition and at trial.
2. Atty. Ziobrowski shall respond to the subpoena duces tecum,. shall withhold privileged materials, shall prepare and serve a privilege log in conformity with Mass.R.Civ.P. 26(b)(5), and shall not be required to testify as to privileged communications beyond authenticating his May 16, 2007, 3:27 p.m. e-mail.[11]
3. The plaintiffs shall produce non-privileged documents (including, without limitation, state and federal tax returns) concerning their assets and income unless, within ten days of the docketing of this decision, they file a notice of their intention to withdraw any claim of damages for emotional distress or other damages premised on impecuniousness (e.g., necessity of selling the Florida home in a bad market, etc.) as opposed to direct investment losses. The parties shall endeavor to agree on the terms of a protective order that will (at least) (a) limit use and disclosure of the plaintiffs’ financial documents and information derived therefrom to this litigation; (b) permit attorneys, consultants, witnesses, and others with a legitimate and litigation-related reason to access to such documents and information to access it only after certifying that they have reviewed and will abide by the terms of the order; and (c) require return or destruction of all such documents information when the litigation has been concluded and all rights of appeal exhausted. Should the parties be unable to agree on the terms of the order, each side shall submit its preferred version, and I will sign the more reasonable of the two.
4. Each side is to bear its own fees and costs of litigating these motions.

 These were two of thirty-two properties held by Fund VI.

 Throughout, the Complaint focuses on Two Technology Drive and its troubles. Little mention is made of the status of the Indiana (751 International Drive) property, although it is alleged that “the TIC [Tenancy in common] properties currently have no equity at all and the Plaintiffs have therefore lost 100% of their investment.” (¶84) This is immediately followed, however, by a qualifier: “Plaintiffs are unable to say how much they have lost because Defendants have failed to provide them with this information.”

 The second page continues with a list of the firm’s offices and the usual (for attorneys’ e-mails) warnings concerning tax advice and confidentiality.

 The focus of the motion to dismiss and the appellate review was the defendants’ argument that the Settlement Agreement’s exculpatory clause (at the end of paragraph 1.3), by which the Bagliones ”acknowledge[d] that, in connection with the foregoing transfer, they have relied on the advice of their own legal and tax experts and not upon any representations made by the New Boston Parties or their agents, representations, or attorneys.”

 Mr. Berthiaume has denied by affidavit that Mr. McLaughlin demanded return of the e-mail (which in any event is now part of the public record in three courts), or that he (Berthiaume) promised to return it, or that the subject was discussed prior to the June 25 letter.

 See, e.g., Grieco v. Fresenius Medical Care Holdings, Inc., 2008 WL 516539 (Mass.Super. 2008; Neel, J.) [23 Mass. L. Rptr. 588] (“A party’s voluntary disclosure of documents which are otherwise protected by the attorney-client privilege waives the privilege as to any other communications pertaining to the same subject matter” (emphasis supplied)).

 Darius was a medical malpractice action involving care rendered at Boston City Hospital. The issue was when the cause of action accrued for purposes of the Tort Claims Act’s presentment requirement; i.e., when the plaintiffs first knew that the hospital and public employees had caused their daughter’s injuries. Presentment was made on January 15, 1998 The City sought discovery concerning the plaintiffs’ first consultation with their litigation counsel, in the spring of 1996 (i.e., within the two-year presentment period).

 An early formulation of the “at issue” waiver doctrine is found in Hearn v. Rhay, 68 F.R.D. 574, 581 (E.D.Wash. 1975), which heid that there is an “at issue” waiver whenever “(1) assertion of the privilege was a result of some affirmative act, such as filing suit, by the asserting party; (2) through this affirmative act, the asserting party put the protected information at issue by making it relevant to the case; and (3) application of the privilege would have denied the opposing party access to information vital to his defense.” This formulation and/or its application in later cases was the target of the criticism discussed in the Darius case, 433 Mass. at 278-79.

 It bears noting that in this case, the defendants make no assertion that the plaintiffs’ attorneys conducted their own due diligence in connection with the transaction; in fact, they have consistently maintained just the opposite, citing the Ziobrowski e-mail as support. See Memorandum in Support of Defendants’ Motion to Dismiss Complaint (8/11/09), p. 7; Brief of the Appellees/Cross Appellants in Appeals Court No. 2010-P-2092 (2/7/11), pp. 13-14.

 Federal returns in the hands of the taxpayer are qualifiedly privileged, subject to “a high standard of relevancy.” Town Taxi, Inc. v. Police Comm'r of Boston, 377 Mass. 576, 587 (1979). Massachusetts state tax returns in the hands of a government agency or of a tax preparer are subject to a statutory privilege, see 62C, §§21, 74, but in the latter instance may be released “pursuant to court order,” which may issue where the taxpayer’s financial condition is in issue. See, e.g., Commonwealth v. Ianelli, 17 Mass.App.Ct. 1011 (1984) (prosecution for arson for insur *483 anee proceeds). The defendants have made the requisite relevancy showing in this case.

 The same rules, obviously, shall apply to any deposition of Atty. McLaughlin, should one be sought.